AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Eastern District of California

| | |
|---|---|
| In the Matter of the Search of )<br><br>7719 52nd Avenue, Sacramento, California, as )<br>described in Attachment A-1 ) | Case No.   2:20-sw-0905 DB |

**FILED**

**Oct 29, 2020**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**REDACTED**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

located in the _____ Eastern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1591(a)(1), (b)(2), (b)(1); 18 U.S.C. 1952(a)(3); 18 U.S.C. § 2421; 21 U.S.C. § 841(a)(1) | Sex Trafficking of a Child, or by Force, Fraud or Coercion; Interstate Travel or Transportation in Aid of Racketeering Enterprises; the Mann Act; and Distribution of Controlled Substances |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

☐ Continued on the attached sheet.

☐ Delayed notice _____ days (give exact ending date if more than 30 _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____ /s/Matthew Catalano (signed electronically) _____
*Applicant's signature*

_____ Matthew Catalano, FBI Special Agent _____
*Printed name and title*

Sworn to telephonically pursuant to Fed. R. Crim. P. 4.1.

Date:   10/06/2020

City and state:  Sacramento, California

_____ DEBORAH BARNES _____
UNITED STATES MAGISTRATE JUDGE

1  McGREGOR W. SCOTT
   United States Attorney
2  BRIAN A. FOGERTY
   Assistant United States Attorney
3  501 I Street, Suite 10-100
   Sacramento, CA 95814
4  Telephone: (916) 554-2700
   Facsimile:  (916) 554-2900
5

6  Attorneys for Plaintiff
   United States of America
7

8                    IN THE UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11   In the Matter of the Search of:              CASE NO.

12  Premises identified in Attachments A-1, A-2,   AFFIDAVIT IN SUPPORT OF APPLICATIONS
    A-3, A-4, and A-5                             UNDER RULE 41 FOR WARRANTS TO SEARCH
13                                                AND SEIZE

14

15

16        I, Matthew Catalano, being first duly sworn, hereby depose and state as follows:

17                   I.      **INTRODUCTION AND AGENT BACKGROUND**

18        1.      I make this affidavit in support of applications under Rule 41 of the Federal Rules of

19  Criminal Procedure for warrants to search the premises known as:

20               a.      7719 52nd Avenue, Sacramento, California (hereinafter, the "52nd Avenue

21                       Residence") identified in Attachment A-1 for things described in Attachment B;

22               b.      2007 Silver Mercedes S550 with California license plate number 7RHL889

23                       (hereinafter, the "Mercedes S550") identified in Attachment A-2 for things

24                       described in Attachment B;

25               c.      White Bayliner boat with registration tag CF 7165 JE and Hull Identification

26                       Number BLBC14CDD585 (hereinafter, the "Bayliner boat") identified in

27                       Attachment A-3 for things described in Attachment B;

28               d.      Michael Anthony Butler, Jr., date of birth ▮▮▮▮▮▮▮▮ (hereinafter,

AFFIDAVIT                              1

1    "Butler") identified in Attachment A-4 for things described in Attachment B; and

2          e.    Maribel Gutierrez, date of birth        (hereinafter, "Gutierrez")

3    identified in Attachment A-5 for things described in Attachment B.

4    2.    I am a Special Agent with the Federal Bureau of Investigation, and have been since

5    March 2009.  I am currently assigned to the Sacramento Division.  While employed by the FBI, I have

6    investigated federal criminal violations related to, among other things, violent crimes, child exploitation,

7    and human trafficking.  I have gained experience through training at the FBI Academy as well as

8    through my work related to conducting these types of investigations and others.  I am a federal law

9    enforcement officer who is engaged in enforcing criminal laws, including 18 U.S.C. § 1591(a)(1), Sex

10    Trafficking of a Child, and I am authorized to request a federal search warrant.

11    3.    The facts in this affidavit come from my personal observations, my training and

12    experience, and information obtained from other agents and witnesses.  This affidavit is intended to

13    show only that there is sufficient probable cause for the requested warrants and does not set forth all of

14    my knowledge about this matter.

15    4.    Based on the facts set forth in this affidavit, there is probable cause to believe that

16    violations of 18 U.S.C. §§ 1591(a)(1) and (b)(2), Sex Trafficking of a Child, 18 U.S.C. §§ 1591(a)(1)

17    and (b)(1), Sex Trafficking by Force, Fraud or Coercion, 18 U.S.C. § 1952(a)(3), Interstate Travel or

18    Transportation in Aid of Racketeering Enterprises,[1] 18 U.S.C. § 2421, the Mann Act, and 21 U.S.C. §

19    841(a)(1), Distribution of Controlled Substances have been committed by Michael Anthony Butler, Jr.

20    There is also probable cause to believe that the items identified in Attachment B will constitute

21    evidence, fruits, contraband, and/or instrumentalities of these criminal violations.

22    **II.    BACKGROUND REGARDING SEX TRAFFICKING**

23    5.    Through my training and experience, I am aware of the following traits of prostitution

24    and how the Internet is used to further the activities of illegal prostitution:

25    a.    Individuals who, through enticement, intimidation, or force, enlist individuals to

26

27    [1] Section 1952(b) defines "unlawful activity" as, among other things, "prostitution offenses in violation of the law of the state in which they are committed."  *See* 18 U.S.C. §§ 1952(a)(3) and (b).

28    California Penal Code sections 653.23(a) (Supervision of Prostitution), 266(h) (Pimping), and 266(i) (Pandering) prohibit the management of prostitution activity in the state of California.

become prostitutes, and who profit from the prostitution of others are called "pimps."

b. Pimps, as well as prostitutes, have embraced the Internet as a means of advertising services and communicating with customers.

c. Pimps often try to recruit new victims by using social media sites such as Facebook.com, Instagram and Snapchat. Pimps often communicate with victims via social media applications after recruiting a victim to work for them. Prostitutes working for the same pimp will often use social media to communicate with each other and their pimp.

d. Certain websites have been created to facilitate communications between prostitutes and their clients. The more notable websites formerly relevant to prostitution in the Eastern District of California include the "Adult" section of Backpage.com as well as nightshift.co. New up and coming escort websites include Skipthegames.com, CityXGuide.com, Megapersonals.com, and Adultlook.com. These websites allow pictures to be posted as part of advertisements. I have viewed prostitution advertisements on each of these websites.

e. Pimps attempt to avoid the attention of law enforcement through the anonymity provided by the Internet.

f. Prostitutes are instructed by the pimp on how to detect undercover officers. When arranging "dates" with clients over the phone, prostitutes rarely discuss the details regarding the sexual acts that are to occur. Those more detailed discussion typically occur when the prostitute and client meet in person.

g. Pimps at times use physical force, threats of physical force, and/or fear to control the prostitutes. They control the prostitutes' actions, and collect money earned through acts of prostitution. Pimps facilitate prostitution by transporting the prostitutes to locations where the prostitution occurs. The pimps, at times, transport prostitutes across state lines for the purpose of prostitution.

h. Prostitutes and/or pimps often stay in motels/hotels while traveling. The prostitutes and pimps travel via rental vehicles, vehicles, airplane, or bus during their travels. The

1    pimps utilize the monies earned during acts of prostitution to purchase food, lodging,

2    clothing and other items.

3    i.   Pimps sometimes possess firearms to facilitate their sex trafficking.

4    j.   The pimps often provide drugs to the prostitutes to suppress their appetites and to assist

5    with the demands of performing sex acts for long periods of time.

6    k.   The term "daddy" is commonly used by prostitutes when referring to their pimps.  The

7    pimp's phone number is often programmed as "daddy" in the prostitutes' cell phone.

8    l.   Pimps often request or force their prostitutes to obtain tattoos of names and/or symbols

9    that are related to the pimp's name or nickname.

10   m.   Prostitutes use cellular telephones as a way to communicate with clients.  These phone

11   numbers are included in the advertisements that are posted on various prostitution-

12   facilitating websites.  Prostitutes, pimps and clients communicate via voice calls, text

13   messages, and messages over social media platforms.

14   n.   Pimps and prostitutes use cellular telephones to transmit photographs to email accounts

15   and/or prostitution advertisement websites.

16   o.   Pimps and prostitutes use personal e-mail accounts to post their advertisements on

17   prostitution advertisement websites.

18   ## III.   PROBABLE CAUSE

19   ### A.    Overview of Investigation

20   6.     Through the investigation in this case, law enforcement has obtained evidence that Butler

21   managed the prostitution activity of then-17-year-old L.L. from the fall of 2018 to August 2019.[2]  Butler

22   took L.L. to hotels throughout Northern California and in Reno, Nevada in order for L.L. to engage in

23   prostitution for his financial benefit.  At times during his trafficking of L.L., he also managed the

24   prostitution activity of adult females, including A.M. and Gutierrez.[3]  Butler supplied A.M. with

25   methamphetamine in order to force or coerce her to engage in additional acts of prostitution for his

26   financial benefit.  There is now evidence that Butler continues to manage the prostitution activity of

27   _____

28   [2] L.L.'s true name and date of birth are known to law enforcement.

[3] A.M.'s true name is known to law enforcement.

1  Gutierrez throughout Northern California.

2       7.     On October 1, 2020, a Grand Jury sitting in Sacramento returned a sealed one-count

3  indictment charging Butler with Sex Trafficking of a Child, in violation of 18 U.S.C. §§ 1591(a)(1),

4  (b)(2).  *See* Case No. 2:20-CR-182-JAM.  As a result, the Honorable Allison Claire issued a warrant for

5  Butler's arrest.  That arrest warrant has yet to be executed.

6       **B.**     **Yuba City Police stopped Butler and 17-year-old L.L. on June 1, 2019.**

7       8.     On June 1, 2019 at approximately 11:05 p.m., Yuba City Police Department Officer

8  Nathan Livingston conducted a traffic stop on a black sport utility vehicle driving with no lights on in

9  Yuba City, California, in violation of California Vehicle Code section 24250.  Officer Livingston found

10  two occupants in the vehicle.  The driver was identified as Michael Anthony Butler, a 39-year-old

11  African American male, from his California identification card.  The passenger was a white female, who

12  was later identified during the traffic stop as 17-year-old L.L.

13       9.     During the traffic stop, Butler told Officer Livingston that he did not have a valid driver's

14  license because it had been suspended for driving under the influence.  Officer Livingston later learned

15  that Butler's license had been suspended and revoked, and that Butler was on formal probation ordered

16  by a judge in Sacramento County for the driving under the influence offense.

17       10.     Butler gave Officer Livingston consent to search his vehicle.  Officer Livingston asked

18  Butler and L.L. to exit the vehicle so it could be searched.  As Butler exited, Officer Livingston was able

19  to see inside L.L.'s purse, where he observed several condoms.  Officer Livingston also saw three cell

20  phones on L.L.'s seat.[4]

21  <u>Butler's initial statements during the traffic stop.</u>

22       11.     When Butler was outside of the vehicle, Officer Livingston and Butler discussed Butler's

23  relationship with L.L. and what the two were doing that evening.  In summary, Butler told Officer

24  Livingston that L.L. was his cousin and that he was driving her from Olivehurst, California, to her home

25

26       [4] Based on my training and experience conducting sex trafficking investigations, I know that sex

27  workers and their traffickers often possess condoms because condoms are a tool of the sex trade.  Based
on my training and experience, I also know that those involved in prostitution and the management of

28  prostitution often possess multiple cell phones that they often use to communicate with prostitution
clients and other participants in the sex trade.

in Sacramento, California.  Officer Livingston became suspicious of Butler's route of travel.[5]  Officer Livingston asked Butler why he would drive out of his way to Yuba City if he was headed south from Olivehurst to Sacramento.  Butler told Officer Livingston that his GPS took him on this route.  Later, Officer Livingston used his cell phone's GPS application to determine the best way to travel from Olivehurst to Sacramento.  The GPS directed Officer Livingston to drive directly south to Sacramento, rather than north to Yuba City, then back south to Sacramento.

12.  After identifying L.L. and learning her age, Officer Livingston asked Butler whether he knew L.L.'s age.  Butler indicated that he knew that L.L. was 17 years old.  At some point during the traffic stop, Butler told Officer Livingston that L.L. was just his "baby cousin."

<u>L.L.'s statements during the traffic stop</u>.

13.  Officer Livingston also spoke to L.L. when she was outside of the vehicle.  In summary, L.L. told Officer Livingston that Butler was her cousin.  However, L.L. was not able to explain the familial relationship between her and Butler.  L.L. also said that she and Butler were driving back from her friend's apartment in Olivehurst and headed to Butler's house for the night.  L.L.'s description of the pair's plans for evening was different than what Butler had told Officer Livingston.

<u>The search of Butler's vehicle</u>.

14.  Officer Livingston searched Butler's vehicle and found several items that are evidence of prostitution activity.  In the back seat of the vehicle, Officer Livingston found women's high heel shoes.  In the trunk, inside a suitcase that Butler identified as his own, Officer Livingston found a purple vibrating sex toy, women's lingerie, and two condoms.  As Officer Livingston continued his search of the vehicle, he located a black "Focused Space" bag.  When he found this bag L.L. stated, "That's my bag," and gave Officer Livingston consent to search the bag.  At that time, Officer Livingston saw Butler staring at L.L. and observed L.L. ask Butler, "What?"  Butler responded, "Nothing."  Inside the bag, Officer Livingston found a Canon digital camera, a black Dell laptop, and a rose gold Apple iPhone, among other things.

///

---

[5] Yuba City is located north of Olivehurst and Sacramento.

15.     Officer Livingston then asked Butler if he could search Butler's body.  Butler agreed.  Inside Butler's pants pocket, Officer Livingston found $1,228 in cash, a Hampton Inn hotel room key, and several hotel cards.[6]

### L.L.'s mother's Statement.

16.     During the traffic stop, Officer Livingston contacted L.L.'s mother, F.Q.  F.Q. told Officer Livingston that L.L. was an unreported missing child.  F.Q. also told Officer Livingston that previously L.L. had been the victim of human trafficking and F.Q. feared that L.L. ran away with the subject again.  F.Q. identified two people who she believed may have trafficked L.L.: (1) a man who she identified as "KD," and (2) a man who had previously been convicted for trafficking L.L. named Kenneth McDaniel.[7]

### Butler's subsequent statements during the traffic stop.

17.     After his conversation with F.Q., Officer Livingston was concerned that Butler may have been trafficking L.L.  Therefore, he detained Butler in handcuffs and placed him in the back of his patrol car.  Officer Livingston then read Butler the *Miranda* admonition.  After Officer Livingston read the admonition, Butler agreed to continue speaking with Officer Livingston.  At this point, Butler indicated that L.L. was not his cousin.  Butler said that he calls L.L. his cousin because of how close they are.  Butler also stated that he knew L.L. was 17 years old and said that he only wanted to get her home.  Butler said that he had known L.L. for only four months.  Butler said that the $1,228 in his pocket was from cashing his paycheck from his job at Dr. Greenthumbs in Sacramento, California.  When asked about the hotel room key in his pocket, Butler denied having a hotel room.

18.     Officer Livingston cited and released Butler for his vehicle code violation.  Butler's vehicle was towed.  Officer Livingston informed Butler that he would not allow L.L. to leave with him because she was a missing juvenile.  Butler told Officer Livingston that was fine.

///

///

---

[6] Based on my training and experience conducting sex trafficking investigations, I know that sex workers often perform commercial sex acts at hotels and motels.

[7] In a later conversation with L.L., but still during the traffic stop, L.L. told Officer Livingston that KD's real name was David Caldwell and that Kenneth McDaniel was her ex-boyfriend.

Post-traffic-stop interview of L.L.

19.     Officer Livingston took L.L. and her belongings—which included the items in the black "Focused Space" bag that she claimed were hers—to the Yuba City Police Department.  When they arrived at the police station, Officer Livingston continued his interview with L.L.  During the interview, which occurred late in the middle of the night, Officer Livingston noted that one of the three cell phones that he had found in L.L.'s seat continued to ring or vibrate.  Officer Livingston noticed that the phone numbers that were calling L.L.'s phone did not appear to be saved contacts on her phone.  He also noticed that not all the phone numbers were the same.  Based on my training and experience, Officer Livingston was likely observing prostitution clients contacting L.L. on the phone used to manage her prostitution activity.  Based on my training and experience, it is likely that these calls, which occurred late at night when prostitution activity increases, were received in response to online prostitution advertisements.  At the end of the interview, L.L. told Officer Livingston that she had something to tell him.  She then told him that the black bag (containing the rose gold Apple iPhone, Canon digital camera and the Dell laptop) did not belong to her, and she asked if police could be return the bag to Butler.

**C.     Interview of L.L. on June 3, 2019**

20.     On June 3, 2019, Officer Livingston met with L.L. to ask for her consent to search her phones and to conduct a follow-up interview.  L.L. provided consent for the search of her three cell phones.  During the interview, L.L. disclosed that she was an escort who has sex with men for money, and that it was both her and Butler's idea for L.L. to be an escort.  L.L. described how their prostitution business worked.  Butler was in charge of advertising L.L. on unidentified websites.  L.L. would then communicate with the men on one of her cell phones, and Butler told L.L. what prices to charge the prostitution clients.  L.L. performed sexual acts with the men and gave the money she earned to Butler.  L.L. said that she had been an escort for Butler for approximately seven months.  L.L. said that just before the traffic stop on June 1, 2019, L.L. had come from an "outcall," which she described as a prostitution encounter during which she would travel to the prostitution client to perform sex acts.  L.L. referred to Butler as her boyfriend.  L.L. said that she and Butler had been having oral sex and sexual intercourse.  L.L. estimated that they had sex approximately 20 times a month and they had been together for seven months (approximately 140 times).

### D.   Interview of L.L. on June 4, 2019

21.     On June 4, 2019, Officer Livingston spoke to L.L. again.  During this conversation, L.L. identified Butler's Snapchat name as "Spice916."[8]  L.L. also discussed how the money that she made was handled.  L.L. said that Butler told her that he was going to get all of the money.  After clients paid L.L., she wound then have to give all the money to Butler.  The men only paid L.L. in cash.  L.L. said that the money that was in Butler's pocket the night they were stopped was the money that L.L. had made that night.  L.L. said that she had three clients that night and they each paid her $350. [9]  L.L. said that Butler would pay her through shopping sprees every two weeks.  During those shopping sprees, Butler allowed L.L. to spend $200 shopping.

22.     L.L. also clarified her timeline with Butler.  L.L. met Butler at the Arden Fair Mall in Sacramento, California in September 2018.  Butler approached her and told her she was cute.  The two exchanged phone numbers.  L.L. initially told Butler that she was 19 years old, but two weeks later told him that she was really 17 years old.  Butler told her that he does not like being lied to, but he continued to talk with her.  Around that time, L.L. started working as an escort, and continued engaging in prostitution from September 2018 to March 2019, and then again beginning in May 28, 2019.

23.     L.L. also said that Butler always carried his laptop, camera, and the rose gold iPhone, all of which were found in the black "Focused Space" bag.  L.L. said that Butler took photographs of other escorts on the camera but had not taken photos of her using his camera.  L.L. said that she believed that Butler used both his laptop and his cell phone to post her (advertisements) on the unidentified websites.

### E.   Yuba City police obtained state warrants to search Butler's devices

24.     Yuba City police obtained a warrant to search Butler's Canon digital camera, the Dell laptop, and the rose gold iPhone.  Yuba City police extracted data from the Canon digital camera and the Dell laptop.  However, they were unable to access Butler's cell phone because it had been locked.[10]

---

[8] I conducted a Google search for the term "Spice916" and found music videos depicting Butler.

[9] In a later interview with L.L., she said that she had only done one outcall the night of the traffic stop and it occurred in an apartment approximately 10-15 minutes from Yuba City, California.  L.L. said that she did not do any "dates" in the Hampton Inn hotel in Yuba City.

[10] On April 29, 2020, the Honorable Carolyn K. Delaney authorized a warrant to search the cell phone.  See case number 2:20-SW-379-CKD.

<u>Cannon Digital Camera</u>

25.     I reviewed the data from Butler's Canon digital camera.  There were 813 photos on the device, including several photos of Butler.  The metadata on the photos reveal that the photos were all taken between April 2, 2019 and May 30, 2019.[11]  Many of the photos on the camera depict other females posing in hotel rooms.  The females are dressed in lingerie and revealing clothing and many are posing provocatively.  Some of the females are nude or partially nude.  The style of these photos is consistent with photos used for advertising prostitution on the internet.  To date, I have been able to identify some of the females captured on Butler's Canon camera.

26.     There are five women who appear in the various series of photos that are consistent with prostitution advertisement photos, which I found on Butler's Cannon digital camera.  Four of the women were photographed in hotel rooms and one appears to have been photographed inside of a small boat.  L.L. and A.M. both identified these photos as having been taken inside Butler's boat, which L.L. described as a Bayliner.[12]  One series of 73 photos depicts a white female who appears to be between the ages of 15 and 20 years old.  She was photographed in what appears to be a hotel bathroom in various stages of dress, to include several fully nude photos of her inside a shower.  To date, I have not yet been able to identify this female.

27.     There are also 20 photographs of L.L. on the digital camera.  According to the metadata on these photos, they were taken on May 30, 2019, and were the most recent photos on the camera.  In these photos, L.L. is fully clothed.  The photos appear to have been taken in a kitchen and in a small bar area inside of a residence.[13]

///

///

---

[11] The metadata on these photos is hidden data that the Canon digital camera captures for each individual file.  The metadata includes the camera settings and the date and time the photo was taken.  Based on my training and experience, the date and time in the metadata is generated by the date and time setting on the camera, which is a manual settings and can therefore be inaccurate.

[12] A.M. knows Butler only by his street name, "Spice."

[13] The photos of L.L. that were found on the Canon digital camera are not the same photos law enforcement has found in prostitution advertisements on the internet, and they are not consistent with photos used to advertise for prostitution.

**F.** **Interview of L.L. on June 11, 2019**

28.     On June 11, 2019, Yuba City Police Detective Scott Rounds interviewed L.L.  During this interview, Detective Rounds showed L.L. an advertisement from a prostitution website called SkiptheGames.com.  The advertisement was posted on June 1, 2019 at 12:09 P.M. for the Sacramento, Yuba City, Marysville, California areas and was titled "Yuba City Upscale Exotic Asian Bomb Shell Unmatched Skills."  The advertisement had several photos attached which depict a white female, who was identified as a 21-year-old named "China."  In these photos, the white female is wearing some form of lingerie, with the exception of one photo in which her breasts are exposed.  The advertisement further describes China's physical characteristics, her availability to do in-calls and out-calls 24 hours a day. The advertisement also contains the following message:

> Hello My Name Is China Im A True Provider With Unmatched Skills and Qualities Im that rare gem youve been searching for with beauty and smarts Let me stimulate your mind, body, and soul. I aim to please, and I also specialize in the art of Pleasure. If your looking to have fun with a beautiful playmate look no further give me a call. 100% INDEPENDENT 100% Real Pics! Unrushed Sessions! No Disappointments! Satisfaction Guaranteed! Call Me 916-562-8158 China

29.     L.L. identified herself as the person depicted in the photos on the above-described prostitution advertisement.  L.L. said that she uses the name "China."  L.L. told Detective Rounds that Butler created the advertisement.  L.L. also indicated that she gave Butler permission to create the advertisement.  L.L. said that she could recall five or six cities she traveled to with Butler.  The farthest she traveled was Monterey, California.  She also identified Sacramento, California as an area where Butler had taken her.  L.L. said that she was not aware of any other girls that Butler pimped who were under the age of 18, and she indicated that all of the other females looked older than 18.

30.     I conducted an online search for prostitution advertisements related to L.L.  I initially located approximately 260 online advertisements containing photos of L.L.  The advertisements were posted almost daily from November 30, 2018, to February 25, 2019.  The advertisements began again on May 30, 2019, and ended on June 1, 2019, which was the evening that Officer Livingston recovered L.L. during the traffic stop.  Most of the advertisements I located were posted for the areas around

1    Sacramento, San Jose, Santa Cruz and Monterey, California, which is consistent with the areas that L.L.

2    recalled traveling to with Butler.  In addition, the dates of these advertisements are also consistent with

3    the dates that L.L. said she worked as an escort for Butler.  Based on my training and experience,

4    victims of sex trafficking often lose track of days and even months, as well as locations where they have

5    been trafficked.  This is often a consequence of their transitory lifestyle, which involves frequently

6    moving from one hotel room in one city to another hotel room and city.

7           G.      **After the June 1, 2019 Traffic Stop, 17-Year-Old L.L. Returned to Engaging in**

8                   **Prostitution under Butler's Control in California and Nevada.**

9           31.     On August 1, 2019, Yuba City police received a 9-1-1 call from A.M.  A.M. reported that

10   she was at the Best Western in Yuba City and needed police assistance.  After police contacted A.M.,

11   she disclosed that she had been engaged in prostitution under the control of a man who she knew as

12   "Spice."  She reported that for approximately a month and a half, Spice had coerced her to engage in

13   prostitution by, among other things, forcing her to use methamphetamine to keep her having sex with

14   clients.  A.M. reported she met Spice through a female she knew as "China."[14]  A.M. indicated that she

15   worked alongside China and another woman who she knew as "Chiquita."[15]  A.M. indicated that Butler

16   took the group to Reno to engage in prostitution in late July 2019, and had just recently returned to

17   California when she called the Yuba City police.

18          32.     Also on August 1, 2019, shortly after police recovered A.M., Officer Livingston went to

19   the parking lot of the Yuba City Best Western.  There, he spoke to an individual in the parking lot who

20   pointed him in the direction of a room where the person suspected prostitution activity was occurring.

21   Officer Livingston then saw a Hispanic male go to a room, enter the room, and depart approximately 30

22   minutes later.  As the man exited the room, he was adjusting his groin region.

23          33.     After observing what he believed to be prostitution activity occurring at the hotel, Officer

24   Livingston saw L.L. leave the hotel building and drive away in a car that was registered to Gutierrez.

25   Officer Livingston stopped the vehicle and subsequently interviewed L.L.  During that interview, L.L.

26   disclosed, in summary, that she had returned to Butler in July 2019 and continued engaging in

27

28          [14] China is L.L.'s alias.

            [15] Chiquita is a known alias for Gutierrez.

1   prostitution under his control.  L.L. confirmed that she had traveled with Butler to Reno where she had

2   engaged in prostitution at casinos.

3       **H.    August 11, 2020 Interview of L.L.**

4       34.     On August 11, 2020, Detective Rounds and I interviewed L.L. again.  During this

5   interview, I asked L.L. to look at several photographs I had obtained from various places, including

6   Butler's Canon digital camera and his Dell laptop.  Among these photographs were photos of the 52nd

7   Avenue Residence, and a house located at 7818 51st Avenue, Sacramento, California (the "51st Avenue

8   Residence").  L.L. indicated that the photograph of the 52nd Avenue Residence depicted Butler's

9   residence.  In that photo of the 52nd Avenue Residence there is a silver sedan parked in the driveway.

10  L.L. identified this vehicle as Butler's Lorinser edition Mercedes.  L.L. said that Butler had driven her to

11  prostitution dates in this vehicle on several occasions.  I have also observed this silver Lorinser

12  Mercedes—i.e., the Mercedes S550 identified in Attachment A-2—with California license plate number

13  7RHL889 parked in the driveway of the 52nd Avenue Residence.  I have also reviewed California

14  Department of Motor Vehicle (DMV) records that indicate that this vehicle is registered to Cathy

15  Lachelle Douglas at the 51st Avenue Residence.

16      35.     When I showed L.L. a photograph of 51st Avenue Residence, she identified it as Butler's

17  mother's residence.  L.L. identified Butler's mother as "Cathy."  L.L. said that Cathy knew that Butler

18  was prostituting her and other girls and would babysit Butler's children, whom he had with another

19  female, Gutierrez, so that Gutierrez could also go out and engage in prostitution for Butler.

20      36.     I also showed L.L. four photos of L.L. in which she identified herself in different places

21  in Butler's residence.  In two of these photos, L.L. identified herself with Gutierrez on Butler's bed in

22  Butler's bedroom.  These photos depict both Gutierrez and L.L. wearing lingerie.  One of these photos

23  depicts Gutierrez kneeling on the bed with L.L. kneeling on top of Gutierrez and kissing Gutierrez on

24  the buttocks.  The second photo depicts L.L. lying down on her back facing the camera with Gutierrez

25  leaning into her.  It appears as though Gutierrez is kissing L.L.'s cheek.  The metadata on these two

26  photos reveal that they were taken on December 20, 2018.

27  ///

28  ///

I.    **Butler Continues to Use the Same Cell Phone Number to Manage Prostitution.**

_Butler recruited victims using cell phone number (916) 604-1056._

37.    Through the course of this investigation, I have viewed videos of Butler that have been posted on the website YouTube.com.  YouTube is an Internet-based video sharing website and application that is owned by Google, Inc.  There are five YouTube videos depicting Butler that were uploaded by YouTube user "Spice223s."  All five Spice223s videos, which were posted on YouTube between approximately three and seven years ago, depict Butler.[16]

38.    I reviewed a video titled "IMG_1583," which was posted on June 23, 2013.  In this video, Butler guides a tour of a hotel suite.  In the video, Butler claims that the suite is located at the Hyatt Regency in Monterey, California.  Butler claims he paid $500 per night to rent the suite.  Near the end of the video, Butler states the following:

> This video is for all the faggot bitches out there, know what I'm
> saying, that be hoeing ya'll asses off and escorting ya'll asses off
> and ya'll don't got nothing to show for it.  Ya feel me.  Fucking with
> a nigga that ain't giving ya nothing.  Bitch.  Come fuck with Spice,
> bitch.  As you can see, I got lots of room for you hoes.

39.    At the end of the video, Butler provides his cell phone number, (916) 604-1056 (hereinafter, "x1056"), followed by the statement "call me, bitch."

_Butler's iPhone that was seized on June 1, 2019_

_was previously assigned the number x1056._

40.    I reviewed the data contained in Butler's rose gold Apple iPhone, which was seized on June 1, 2019.  The device's data indicates that the call number x1056 was previously assigned to this device, which Yuba City Police Officer Livingston found in a bag in Butler's trunk along with Butler's Canon digital camera and Dell laptop.

///

///

///

---

[16] I am familiar with Butler's physical appearance by, among other things, reviewing Butler's California DMV photo.

<u>Butler communicated with L.L. using a cell phone device that was then-assigned</u>

<u>the x1056 call number.</u>

41.     I have reviewed the data contained in L.L.'s iPhone 6S, which L.L. gave to Yuba City police on June 3, 2019.  L.L.'s Apple iPhone 6S' data includes an Apple iMessage (text) conversation with the x1056 number in the hours before Yuba City Police recovered L.L. on June 1, 2019.  L.L. and Butler used a code to communicate about when L.L. had arrived at a prostitution client's room and when the client had finished.  In an interview with Yuba City Police in August 2019, L.L. explained that a text with the number "1" meant that she had arrived at the client's room.  And a text with the letter "D" meant that she had completed the date.  I found text communications between L.L. and x1056 on June 1, 2019 that are consistent with what L.L. described.

42.     L.L.'s Apple iPhone 6S also contains text conversations during which Butler and L.L. discussed the fact that after the June 1, 2019 traffic stop, L.L. would be put in a foster home.  In this conversation, L.L. called Butler "Daddy," which is a term that sex workers often use to refer to their pimp.  Also in the conversation on June 2, 2019, L.L. asked Butler if it was his mother's birthday.  According to California DMV records, Cathy Douglas' birthday is June 2.

43.     Set forth below are excerpts of the conversation between L.L. and the user of the x1056 number on June 2, 2019:

Butler: Hey are you ok

L.L.:    Yea they put me in a foster home

L.L.:    Are you okay?  They kept trying to get me to tell them stuff
          but I didn't say shit

Butler: I thought your mom was coming to get

Butler: I told them I was tryin to take you home but they didn't
          believe me

                              *          *          *

L.L.:    Tomorrow the cps people from where I'm from are gunna be
          here in the moring I think

L.L.:    Like 12 tomorrow

Butler: That's cool

L.L.:   Today's your moms birthday huh

x1056 is listed on hotel records between 2018 and 2020.

44.     Through the course of my investigation, I have reviewed evidence indicating that Butler and Gutierrez have rented and stayed in hotels in locations in the Eastern, Northern and Central Districts of California and in the District of Nevada.  Specifically, L.L. and A.M. disclosed that Butler rents these rooms at hotels in or order to manage ongoing prostitution activity.  L.L. and A.M. described how Butler moved his prostitution operation from city-to-city, with his victims often engaging in prostitution at hotels.

45.     A.M. reported that she engaged in prostitution under Butler's control from approximately June 2019 to August 2019.  At the time, A.M. was 19 years old.  A.M. reported that at the time, Butler was also managing the prostitution activity of 17-year-old L.L. and Gutierrez.  A.M. disclosed that in July 2019, the aforementioned group traveled from California to Reno, Nevada in order to engage in prostitution at hotels and casinos in Reno.

46.     In the course of this investigation, I have reviewed hotel records indicating that Butler rented many hotel rooms in Northern California and Reno since late 2018.  I have seen numerous hotel records indicating that Butler listed x1056 as his contact telephone number.

x1056 was recently used as part of Butler's pattern of managing prostitution.

47.     As a recent example, x1056 is listed on records provided by the Best Western in Yuba City, California.  The records indicate that Gutierrez checked into the Yuba City Best Western on or about June 17, 2020.[17]  During an interview with A.M. on September 22, 2020, A.M. reported that Butler would have Gutierrez check into the hotel rooms for Butler, because Butler was not supposed to be seen at the hotels.   I have also seen prostitution advertisements which depicted Gutierrez posted in Yuba City, California on June 17 and 18, 2020 on the website privatedelights.com.

48.     Gutierrez's recent presence at the Yuba City Best Western and the aforementioned prostitution advertisements are consistent with Butler's and Gutierrez's pattern of using the Best

---

[17] This is Gutierrez's last stay at the Best Western in Yuba City, California.  According to the manager, Gutierrez was added to the "DNR" (do not rent) list after another guest at the hotel complained that Gutierrez was "working" out of the room and complained about the foot traffic coming and going from her room.

Western (and other hotels) to engage in prostitution.  On August 1, 2019, A.M. reported engaging in prostitution under Butler's control at that same hotel.  A.M. reported that Gutierrez and L.L. were also at the hotel with Butler.  Shortly after A.M.'s August 1, 2019 report to the Yuba City police, an officer found L.L. at the Yuba City Best Western, and L.L. disclosed that she was there to engage in prostitution under Butler's management.  Yuba City Best Western records confirm that Butler rented a room at the hotel on August 1, 2019.

Butler recently brought females to a Sacramento hotel.

49.     On August 12, 2020, I received a phone call from the manager of the Residence Inn Cal Expo, which is located at 1530 Howe Avenue in Sacramento.  The manager told me that Butler had stayed at the hotel on August 10, 2020, and that Butler was attempting to stay at the hotel again on August 12.  The manager declined to rent a room to Butler and watched Butler depart the hotel property. The manager saw Butler get into the back seat of a green Honda Accord.  Seated next to Butler in the car was a younger African American girl and the driver was an older looking Hispanic female.  During my interview with L.L. on August 11, 2020, L.L. identified this hotel as the first place that she engaged in prostitution under Butler's management.  During interviews with law enforcement, L.L. also identified the Residence Inn Cal Expo as the hotel where Butler took photos depicting her in lingerie and partially nude, which were subsequently posted on online prostitution advertisements.

X1056 is a contact number on Butler's Comcast account as of July 22, 2020.

50.     I have reviewed Comcast Corporation subscriber records for an account at the 51st Avenue Residence.  L.L. reported that Butler's mother resides at this residence.  Comcast records indicate that based on records reviewed for the time period January 1, 2018 through July 22, 2020, Michael Butler is the subscriber for Comcast services at the 51st Avenue Residence.  As of July 22, 2020, x1056 is listed as a contact number for Michael Butler's account.

Butler's mother is the subscriber for x1056

51.     I have reviewed subscriber and toll records for x1056.  These records include subscriber and toll data through September 21, 2020.  These records indicate that since August 2, 2009, the subscriber for x1056 has been Cathy Douglas at the 51st Avenue Residence.

52.     The subscriber records for x1056 also indicate that x1056 has been linked to multiple

International Mobile Equipment Identity (IMEI) numbers.  IMEI numbers are unique numbers assigned to cell phone devices.  This means x1056 has been assigned to multiple cell phone devices since August 2, 2009.  Based on my training and experience, I know that this could mean that over the years, the user of x1056 transferred the user's telephone number—possibly by transferring a SIM card—from one cell phone device to another.  Based on my training and experience, I know that it is common for individuals to transfer an existing cell phone number to a new cell phone device.  I also know that it is common for cell phone users to transfer the data from an existing cell phone to the new cell phone device.  Based on my training and experience, I know that the cell phone user can accomplish this data transfer from an existing cell phone device to a new one by transferring the cell phone's SIM cards and downloading the old device's data from a cloud storage account (for example, an iCloud account), or by enlisting the assistance of a representative of the cell phone retailer, manufacturer, or the cell phone service provider.  Accordingly, there is probable cause to believe that evidence of Butler's prostitution of L.L., A.M., and Gutierrez—including, for example, electronic messages and photos— and others, in addition to evidence of his ongoing prostitution management, will be located on the device assigned x1056, despite the fact that since August 2019, Butler has obtained a new cell phone device.

### J.    **Butler harbors his victims at the 52nd Avenue Residence.**

#### There is a pile of victims' belongings in the 52nd Avenue garage.

53.    During an interview with law enforcement officers, A.M. disclosed that she has been inside Butler's 52nd Avenue Residence.  A.M. reported that the garage contains a pile of personal items that appear to belong to females.  A.M. estimated that the pile consists of personal items that belonged to approximately 40 females.  A.M. indicated that when she began engaging in prostitution under Butler's control, she was instructed to leave her own personal belongings with the pile of other personal items.  A.M. also disclosed that later, Butler allowed A.M. and other females who were engaging in prostitution for him to take items from the pile.  Butler described this as the females "shopping."  A.M. told law enforcement that some of the items appeared to have been in the garage so long that they had collected dust.[18]

---

[18] FBI's National Crime Information Center (NCIC) records indicate that:

On February 21, 2002, Butler was convicted of Sexual Intercourse with a Minor, in violation of

54.     A.M. never recovered her own personal items from the 52nd Avenue Residence garage. A.M. left a tablet device and her own mail (which includes her name and address) at the 52nd Avenue Residence.  A.M. also left her bank car at the 52nd Avenue Residence.  Since leaving the card at the 52nd Avenue Residence, A.M. has noticed unauthorized charges on the corresponding bank account.

<u>Butler stores controlled substances at the 52nd Avenue Residence.</u>

55.     During an interview with law enforcement officers, L.L. disclosed that she saw Butler store a large bag of crystal methamphetamine in a freezer in the 52nd Avenue Residence.  L.L. indicated that when she was with Butler in 2018 and 2019, Butler was selling crystal methamphetamine, heroin, and ecstasy pills from the 52nd Avenue Residence.  L.L. stated that Butler gave a woman methamphetamine in exchange for her cleaning the house.

56.     As set forth above in paragraphs 31 through 33, Yuba City police recovered L.L. from a Best Western on August 1, 2019.  Best Western records indicate that Butler had rented a room at that hotel on August 1, 2019.  During the post-recovery interview with Yuba City police, L.L. described how Butler managed her prostitution activity in late July 2019 in California and Nevada.  Also during that interview, Yuba City police found that L.L. possessed small quantities of methamphetamine, heroin, and MDA.  L.L. told Yuba City police that Butler had given those drugs to L.L. to hold for him as they left the hotel room earlier that day.

<u>Butler was previously convicted of a drug offense.</u>

57.     According to NCIC records, on November 30, 1998, Butler was convicted of Possession/Purchase of Cocaine Base for Sale, in violation of California Health & Safety Code section 11351.5.

<u>Gutierrez is the Comcast subscriber at the 52nd Avenue Residence.</u>

58.     I have reviewed Comcast Corporation subscriber records for an account at the 52nd Avenue Residence.  The records are dated July 22, 2020.  The records indicate that Gutierrez was the subscriber on an active account for high speed internet service at the 52nd Avenue Residence.  The

---

California Penal Code section 261.5(c).  This conviction was from Sacramento County Superior Court.

On February 6, 2006, Butler was again convicted of Sexual Intercourse with a Minor, in violation of California Penal Code section 261.5.  This conviction was from San Joaquin County Superior Court.

1    Comcast records also provided a non-Comcast telephone number for Gutierrez, 916-680-1080

2    (hereinafter, "x1080"), as of July 22, 2020.  I have reviewed at least one adultlook.com prostitution

3    advertisement dated September 27, 2020, which depicts Gutierrez.  The posting advertises Gutierrez in

4    Mendocino, California.  This advertisement lists x1080 as the contact number for Gutierrez.  The

5    advertisement contains photos of Gutierrez posing on a bed that L.L. identified as Butler's bed in the

6    52nd Avenue Residence.

7            A router at the 52nd Avenue Residence is broadcasting a wireless network linked to Butler.

8            59.    A review of Butler's rose gold iPhone S revealed that the device had been connected to a

9    Wi-Fi network called "Spice," which is Butler's alias.  A review of L.L.'s Apple iPhone 7 also revealed

10   that her device had been connected to a Wi-Fi network named "Spice."  Data from L.L.'s iPhone 7

11   indicate that that device automatically connected to the "Spice" network on June 1, 2019.

12           60.    On September 15, 2020, I walked on the sidewalk in front of the 52nd Avenue Residence

13   while I used a cell phone to observe the Wi-Fi networks that were broadcasting in the area.  When I was

14   directly in front of the 52nd Avenue Residence, I observed a strong signal for a locked Wi-Fi network

15   named "Spice."  This network was one of the two strongest Wi-Fi network signals my cell phone

16   detected when I was located directly in front of the 52nd Avenue Residence.

17   **K.    Butler uses his Mercedes S550 to transport victims and drugs.**

18           Butler used the Mercedes S550 as part of his prostitution business.

19           61.    Both L.L. and A.M. told law enforcement that Butler drove them in his Mercedes S550

20   while he was controlling their prostitution activity.  L.L. told law enforcement that Butler used that

21   vehicle as well as rental cars to transport her to and from out-calls and hotels where she had sex with

22   men in exchange for money.  L.L. also disclosed that occasionally she would drive the Mercedes S550

23   because Butler did not have a valid driver's license.

24           Butler used the Mercedes S550 to transport drugs.

25           62.    A.M. told law enforcement that Butler used the Mercedes S550 to drive her to a house

26   located near the 52nd Avenue Residence where Butler purchased drugs.  A.M. was aware that Butler

27   was going to this house in order obtain drugs.  A.M. only saw Butler with user amounts of drugs.

28   ///

1    **L.      Butler harbors victims on his Bayliner boat.**

2    63.     Butler is the registered owner of a 1985 Bayliner boat with registration number 7165JE—

3    i.e., the Bayliner boat identified in Attachment A-3.  Both L.L. and A.M. disclosed that Butler took them

4    on the Bayliner boat.  L.L. described the vessel as a "Bayliner."  A.M. disclosed that she engaged in

5    prostitution under Butler's control for approximately one and half months and during that time, Butler

6    gave her one day off from engaging in sex work.  She spent that day off with Butler on the Bayliner

7    boat.

8    64.     Butler's Canon digital camera contains a series of photos depicting an African American

9    female in various stages of undress.  The photos, including the female's clothing and poses, are

10   consistent with photographs used in prostitution advertisements.  Both L.L. and A.M. indicated that

11   these photos appear to have been taken on the Bayliner boat.

12   65.     A.M. reported to law enforcement that she saw Butler on the Bayliner boat in early

13   September 2020.  A.M. indicated that the Bayliner boat was docked at a pier near the Tower Bridge in

14   Sacramento.  A.M. saw Butler on the Bayliner boat along with friends during what appeared to be a boat

15   party.

16                        **IV.      TECHNICAL TERMS**

17   66.     Based on my training and experience, I use the following technical terms to convey the

18   following meanings:

19        a)  Internet: The Internet is a global network of computers and other electronic devices that

20            communicate with each other.  Due to the structure of the Internet, connections between

21            devices on the Internet often cross state and international borders, even when the devices

22            communicating with each other are in the same state.

23        b)  Storage medium: A storage medium is any physical object upon which computer data can

24            be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-

25            ROMs, and other magnetic or optical media.

26   **V.      COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS**

27   67.     As described above and in Attachment B, this application seeks permission to search for

28   records that might be found on the premises identified in Attachments A-1, A-2, A-3, A-4, and A-5, in

AFFIDAVIT                                21

1  whatever form they are found.  One form in which the records might be found is data stored on a

2  computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure

3  of electronic storage media or, potentially, the copying of electronically stored information, all under

4  Rule 41(e)(2)(B).

5       68.    *Probable cause.*  I submit that if a computer or storage medium is found on the premises

6  identified in Attachments A-1, A-2, A-3, A-4, and A-5, there is probable cause to believe those records

7  will be stored on that computer or storage medium, for at least the following reasons:

8       a) Based on my knowledge, training, and experience, I know that computer files or

9          remnants of such files can be recovered months or even years after they have been

10         downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files

11         downloaded to a storage medium can be stored for years at little or no cost.  Even when

12         files have been deleted, they can be recovered months or years later using forensic tools.

13         This is so because when a person "deletes" a file on a computer, the data contained in the

14         file does not actually disappear; rather, that data remains on the storage medium until it is

15         overwritten by new data.

16      b) Therefore, deleted files, or remnants of deleted files, may reside in free space or slack

17         space—that is, in space on the storage medium that is not currently being used by an

18         active file—for long periods of time before they are overwritten.  In addition, a

19         computer's operating system may also keep a record of deleted data in a "swap" or

20         "recovery" file.

21      c) Wholly apart from user-generated files, computer storage media—in particular,

22         computers' internal hard drives—contain electronic evidence of how a computer has been

23         used, what it has been used for, and who has used it.  To give a few examples, this

24         forensic evidence can take the form of operating system configurations, artifacts from

25         operating system or application operation, file system data structures, and virtual memory

26         "swap" or paging files.  Computer users typically do not erase or delete this evidence,

27         because special software is typically required for that task.  However, it is technically

28         possible to delete this information.

d)   Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

69.   *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium on the premises described in Attachments A-1, A-2, A-3, A-4, and A-5 because:

a)   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b)   As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of

occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contains information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c)  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d)  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e)  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f)  I know that when an individual uses a computer to manage prostitution and/or sell drugs, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The computer is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

70.  *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to

ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

    a)   The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

    b)   Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

    c)   Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

71. *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by

1  the warrant.

2  72.    Because several people may share the 52nd Avenue Residence as a residence, it is

3  possible that the 52nd Avenue Residence will contain storage media that are predominantly used, and

4  perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that that it

5  is possible that the things described in this warrant could be found on any of those computers or storage

6  media, the warrant applied for would permit the seizure and review of those items as well.

7  **VI.     CONCLUSION**

8  73.    I submit that this affidavit supports probable cause for warrants to search the premises

9  described in Attachments A-1, A-2, A-3, A-4, and A-5 and seize the items described in Attachment B.

10  **VII.     REQUEST FOR SEALING**

11  74.    It is respectfully requested that this Court issue an order sealing, until further order of the

12  Court, all papers submitted in support of this application, including the application and search warrant.  I

13  believe that sealing this document is necessary because the items and information to be seized are

14  relevant to an ongoing investigation into the criminal organizations as not all of the targets of this

15  investigation will be searched at this time.  Based upon my training and experience, I have learned that

16  online criminals actively search for criminal affidavits and search warrants via the Internet, and

17  disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online

18  through the carding forums.  Premature disclosure of the contents of this affidavit and related documents

19  may have a significant and negative impact on the continuing investigation and may severely jeopardize

20  its effectiveness.

21

22  Respectfully submitted,

23

24  /s/Matthew Catalano (signed electronically)
   Matthew Catalano

25  Special Agent
   Federal Bureau of Investigation

26

27

28

Subscribed and sworn telephonically
pursuant to Fed. R. Crim. P. 4.1 on:   _10/06/2020_____

_____
DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

_/s/ Brian A. Fogerty_____
Approved as to form by:
Assistant U.S. Attorney Brian A. Fogerty

## ATTACHMENT A-1

### Property to be searched

The property to be searched is the entire property located at 7719 52nd Avenue, Sacramento, California, 95828, including the residential building, any outbuildings, and any appurtenance thereto, any cell phone, computer or storage medium found therein, and any person located at the property.  The property contains a two-story residence with tan colored stucco siding, red-brown trim, a white metal security screen front door and a white garage door.  To the left of the garage door is the address number "7719" on black on a white sign.  Below is an image of the property:



The search is to include:  all rooms, closets, safes, cabinets, hidden compartments, outbuildings, and storage facilities on the premises.

## ATTACHMENT A-2

## Property to be searched

The property to be searched is a 2007 silver Mercedes S550 with California license plate number 7RHL889 and registered to Cathy Douglas, 7818 51st Avenue, Sacramento, California 95828, including any compartments, containers, luggage, and any cell phone, computer or storage medium found therein.



## ATTACHMENT A-3

## Property to be searched

The property to be searched is a white Bayliner boat with registration tag "CF 7165 JE," and Hull Identification Number: BLBC14CDD585, which is registered to Michael Anthony Butler, 7818 51st Avenue, Sacramento, California 95828, including any compartments, containers, luggage, and any cell phone, computer or storage medium found therein.



## ATTACHMENT A-4

### Person to be searched

The person to be searched is Michael Anthony Butler, Jr., date of birth ▆▆▆▆▆▆

▆▆ including any containers, cell phone, computer or storage medium found thereon.



**ATTACHMENT A-5**

**Person to be searched**

The person to be searched is Maribel Gutierrez, date of birth ▮▮▮▮▮▮▮ including any containers, cell phone, computer or storage medium found thereon.



**ATTACHMENT B**

**Items to be seized**

1.      All records relating to violations of  18 U.S.C. §§ 1591(a)(1), (b)(2), Sex Trafficking of a Child, 18 U.S.C. §§ 1591(a)(1), (b)(1), Sex Trafficking by Force, Fraud or Coercion, 18 U.S.C. § 1952(a)(3),  Interstate Travel or Transportation in Aid of Racketeering Enterprises, 18 U.S.C. § 2421, the Mann Act, and 21 U.S.C. § 841(a)(1), Distribution of Controlled Substances, those violations involving Michael Anthony Butler, Jr., including:

     a.   Records, images, videos, and communications regarding L.L. and/or A.M.;

     b.   Records, images, videos, and communications regarding the management of prostitution activity.

     c.   Records, images, videos, and communications regarding the advertisements of acts of prostitution, including use of Skipthegames.com and adultlook.com.

     d.   Records, images, videos, and communications regarding hotel reservations;

     e.   Hotel room keys;

     f.   Records, images, videos, and communications regarding YouTube user Spice223s;

     g.   Records, images, videos, and communications identifying Michael Anthony Butler, Jr. as "Spice," "Spice916," and/or "Spice223s";

     h.   Condoms;

     i.   Sex toys;

j.  Any cell phone, computer, or electronic storage media currently or previously assigned call number (916) 604-1056;

k.  Computer or storage media that belonged to A.M.;

l.  U.S. mail addressed to A.M.;

m.  Clothing, identification, and/or electronic devices that belonged to individuals who engaged in prostitution.

n.  Records, images, videos, and communications regarding any travel involving L.L., A.M., and/or Maribel Gutierrez for the purpose of engaging in prostitution;

o.  Controlled substances, including methamphetamine, heroin, MDA, and/or MDMA (ecstasy);

p.  Drug paraphernalia, including liters, pipes, syringes, scales, measuring devices, diluting or cutting agents, packaging materials, including plastic, tin foil, cellophane, jars, plastic bags, and other containers;

q.  Records, images, videos, and communications regarding the source or supplier of controlled substances;

r.  Records, images, videos, and communications regarding the purchaser of any controlled substance;

s.  United States currency that is the proceeds of prostitution and/or drug trafficking;

t.  Indicia of occupancy, residency, control or ownership of the premises and the things described in this warrant, including utility bills, telephone bills, loan repayment receipts, rent documents, envelopes and keys, photographs, and bank records;

2.  Computers or storage media used as a means to commit the violations described above, including computers or storage media used to manage prostitution and/or distribute controlled substances.

3.  For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.  evidence of the lack of such malicious software;

d.   evidence indicating how and when the computer was accessed or used to
determine the chronological context of computer access, use, and events relating
to crime under investigation and to the computer user;

e.   evidence indicating the computer user's state of mind as it relates to the crime
under investigation;

f.   evidence of the attachment to the COMPUTER of other storage devices or similar
containers for electronic evidence;

g.   evidence of counter-forensic programs (and associated data) that are designed to
eliminate data from the COMPUTER;

h.   evidence of the times the COMPUTER was used;

i.   passwords, encryption keys, and other access devices that may be necessary to
access the COMPUTER;

j.   documentation and manuals that may be necessary to access the COMPUTER or
to conduct a forensic examination of the COMPUTER;

k.   records of or information about Internet Protocol addresses used by the
COMPUTER;

l.   records of or information about the COMPUTER's Internet activity, including
firewall logs, caches, browser history and cookies, "bookmarked" or "favorite"
web pages, search terms that the user entered into any Internet search engine, and
records of user-typed web addresses;

m.  contextual information necessary to understand the evidence described in this attachment.

4.      Routers, modems, and network equipment used to connect computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

5.      This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a

complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of ) | |
| ) | |
| 7719 52nd Avenue, Sacramento, California, as ) described in Attachment A-1 ) | Case No.   2:20-sw-0905 DB |
| ) | |

**SEALED**

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ California _____
*(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before _____ October 20, 2020 _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: <u>any authorized U.S. Magistrate Judge in the Eastern District of California.</u>

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
     ☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:     _____ 10/06/2020 10:15 a.m. _____

City and state:     Sacramento, California     _____
                                                    DEBORAH BARNES
                                                    UNITED STATES MAGISTRATE JUDGE

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____          _____
                    Signature of Judge                                              Date

## ATTACHMENT A-1

### Property to be searched

The property to be searched is the entire property located at 7719 52nd Avenue, Sacramento, California, 95828, including the residential building, any outbuildings, and any appurtenance thereto, any cell phone, computer or storage medium found therein, and any person located at the property. The property contains a two-story residence with tan colored stucco siding, red-brown trim, a white metal security screen front door and a white garage door. To the left of the garage door is the address number "7719" on black on a white sign. Below is an image of the property:



The search is to include: all rooms, closets, safes, cabinets, hidden compartments, outbuildings, and storage facilities on the premises.

## ATTACHMENT B

## Items to be seized

1.      All records relating to violations of  18 U.S.C. §§ 1591(a)(1), (b)(2), Sex Trafficking of a Child, 18 U.S.C. §§ 1591(a)(1), (b)(1), Sex Trafficking by Force, Fraud or Coercion, 18 U.S.C. § 1952(a)(3),  Interstate Travel or Transportation in Aid of Racketeering Enterprises, 18 U.S.C. § 2421, the Mann Act, and 21 U.S.C. § 841(a)(1), Distribution of Controlled Substances, those violations involving Michael Anthony Butler, Jr., including:

   a.   Records, images, videos, and communications regarding L.L. and/or A.M.;

   b.   Records, images, videos, and communications regarding the management of prostitution activity.

   c.   Records, images, videos, and communications regarding the advertisements of acts of prostitution, including use of Skipthegames.com and adultlook.com.

   d.   Records, images, videos, and communications regarding hotel reservations;

   e.   Hotel room keys;

   f.   Records, images, videos, and communications regarding YouTube user Spice223s;

   g.   Records, images, videos, and communications identifying Michael Anthony Butler, Jr. as "Spice," "Spice916," and/or "Spice223s";

   h.   Condoms;

   i.   Sex toys;

j.   Any cell phone, computer, or electronic storage media currently or previously assigned call number (916) 604-1056;

k.   Computer or storage media that belonged to A.M.;

l.   U.S. mail addressed to A.M.;

m.   Clothing, identification, and/or electronic devices that belonged to individuals who engaged in prostitution.

n.   Records, images, videos, and communications regarding any travel involving L.L., A.M., and/or Maribel Gutierrez for the purpose of engaging in prostitution;

o.   Controlled substances, including methamphetamine, heroin, MDA, and/or MDMA (ecstasy);

p.   Drug paraphernalia, including liters, pipes, syringes, scales, measuring devices, diluting or cutting agents, packaging materials, including plastic, tin foil, cellophane, jars, plastic bags, and other containers;

q.   Records, images, videos, and communications regarding the source or supplier of controlled substances;

r.   Records, images, videos, and communications regarding the purchaser of any controlled substance;

s.   United States currency that is the proceeds of prostitution and/or drug trafficking;

      t.    Indicia of occupancy, residency, control or ownership of the premises and the things described in this warrant, including utility bills, telephone bills, loan repayment receipts, rent documents, envelopes and keys, photographs, and bank records;

2.      Computers or storage media used as a means to commit the violations described above, including computers or storage media used to manage prostitution and/or distribute controlled substances.

3.      For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

      a.    evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

      b.    evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

      c.    evidence of the lack of such malicious software;

d.   evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.   evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.   evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.   evidence of the times the COMPUTER was used;

i.   passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.   documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.   records of or information about Internet Protocol addresses used by the COMPUTER;

l.   records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.  contextual information necessary to understand the evidence described in this

attachment.

4.       Routers, modems, and network equipment used to connect computers to the

Internet.

As used above, the terms "records" and "information" includes all forms of creation or

storage, including any form of computer or electronic storage (such as hard disks or other media

that can store data); any handmade form (such as writing); any mechanical form (such as printing

or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives,

videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical,

or other high speed data processing devices performing logical, arithmetic, or storage functions,

including desktop computers, notebook computers, mobile phones, tablets, server computers, and

network hardware.

The term "storage medium" includes any physical object upon which computer data can

be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and

other magnetic or optical media.

5.       This warrant authorizes a review of electronic storage media and electronically

stored information seized or copied pursuant to this warrant in order to locate evidence, fruits,

and instrumentalities described in this warrant.  The review of this electronic data may be

conducted by any government personnel assisting in the investigation, who may include, in

addition to law enforcement officers and agents, attorneys for the government, attorney support

staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a

complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.